Hyman Korn, J.
The relator Rudolph Blunt, by way of a writ of habeas corpus, seeks his release from Bikers Island on the grounds that the New York State Narcotic Addiction Control Commission, hereinafter referred to as NACO, has failed to provide rehabilitative treatment for his drug addiction.
A hearing was held pursuant to a direction of this court and extensive testimony was adduced with respect to the issue raised by the relator.
Relator was convicted of a misdemeanor on October 17, 1967. Though such violation would ordinarily have subjected him to punishment for no more than one year at the penitentiary, as a convicted addict, he was committed to the custody of the NACC for an indefinite period not to exceed 36 months (Mental Hygiene Law, § 208). He is presently at Bikers Island in the custody of the Addiction Service Agency, hereinafter referred to as ASA. This agency administers the narcotics program in the City of New York for criminal addicts under a contract entered into between the State of New York and City of New York.
Specifically it is relator’s contention that he is being treated in no different manner than the other nonaddict inmates at the prison. Testimony offered by the relator was to the effect that he and the other committed criminal addicts live and work with nonaddict prisoners and are subject to the same prison routine and regulations as their nonaddict cellmates. However, where *59 the nonaddict cellmates are released within one year, relator and other criminal addicts may be held for a period of 36 months.
Blunt asserts that no psychiatric or psychological therapy, or vocational training has been made available to him under the claimed narcotic program and that the only activity offered him by the ASA was participation in hourly group meetings held two or three times a week and conducted by addicts and ex-addicts. It is his position that these meetings are worthless and that the so-called narcotics program is pure show. While he does not challenge the legality of his original commitment, he maintains that his continued confinement under these circumstances is unlawful.
There are presently pending several hundred writs brought by similarly convicted criminal addicts at Bikers Island who make substantially the same allegations as petitioner. These writs seriously question whether any real effort is being made by the ASA to bring rehabilitative treatment to the addicts in its custody.
The respondent seriously contests relator’s claim and asserts that there is presently on Bikers Island a bona fide and meaningful program under which effective rehabilitative treatment is afforded to the committed criminal addict.
The lengthy hearing held herein was to determine solely the one issue, to wit: Is relator and others similarly situated being afforded rehabilitative treatment for their narcotics addiction as mandated by the Mental Hygiene Law.
The evidence presented shows that following his sentencing, relator was sent to Bikers Island. There is no dispute that on his arrival at Bikers Island, he underwent the same classification procedures as newly arrived nonaddict prisoners, and, when sent to the penitentiary, was assigned a cell with a nonaddict inmate. Petitioner’s daily routine during the almost one year he has been on Bikers Island is almost identical with that followed by his nonaddict cellmates. There are no separate school or work facilities for addict prisoners. Whether the addict goes to school, as relator did, or to work, in the various prison vocational shops, both programs are under the complete control of the regular prison administration.
The ASA which, as stated, is under contract to operate the narcotics program at Bikers Island, first contacts the addict after he has been classified and assigned to school or a prison job by the prison authorities. At this first contact the addict is told, in essence, about the various phases of the narcotic program and is urged to attend the hourly group meetings held several times a week at the prison. The person assigned by the agency *60 to solicit the prisoner’s attendance at these meetings is generally a fellow addict-prisoner who is in the same program but at an advanced stage. Although participation in these group meetings is voluntary, it would appear many addicts initially elect to attend if for no greater reason than the knowledge that co-operation with the authorities may facilitate release before three years. These sessions are open as well to all prisoners who wish to attend, whether or not they have been certified as addicts and committed under the Mental Hygiene Law. When an addict refuses to attend, he receives no other form of therapy and continues at Bikers Island as any other regular prison inmate. These group meetings are for the most part conducted by “ Group Leaders ” who themselves are convicted criminal addicts who have progressed to a latter stage in a narcotic program.
Admittedly, the meetings are considered motivational rather than rehabilitative; their main purpose being to engender in the addict a sincere desire to break his habit, change his way of life, and accept rehabilitation.
Essentially all that happens at these group meetings is that the prisoner is encouraged to talk about his problems. Aside from such attendance he ordinarily receives no other therapy while at Bikers Island, nor has any other contact with the ASA. There is no professional direction or supervision provided directly to the addict. As a rule, he sees neither psychiatrist nor psychologist.
In the instant case, relator attended the group meetings for a period of seven months and refused to continue, and is presently in no other program. Parenthetically, about 50% of the addicts committed to the custody of ASA now refuse to participate in the program.
In its defense ASA presented several witnesses who sought to show that meaningful rehabilitative treatment is being offered. As contemplated by ASA, the narcotic rehabilitation program is basically of the self-help group therapy oriented type. It is accomplished in three phases. First, a series of group meetings at which the addicts are hopefully motivated to accept rehabilitative treatment. In this first phase the addict progresses through three distinct group levels labeled O, B and A. His progress through these groups is dependent to a great extent upon the interest he shows in the program. Hpon successfully demonstrating a sincere desire for rehabilitation, the prisoner is sent from Group A to Harts Island where he enters the second phase of the program. Additionally the witnesses testified that in this second phase, the addict is instructed in *61 communal living. It is claimed that on Harts Island he receives intensive treatment and may receive professional psychiatric or psychological therapy, if required. When he has progressed sufficiently, the addict enters the third, or re-entry phase. In this third phase, he is released conditionally to a half way house and continues further treatment until he can be certified as rehabilitated.
Since the program’s inception, over 600 addicts have been committed to Bikers Island in the custody of the ASA. There are presently 185 such addicts in the second or Harts Island phase. To date only 20 to 25 addicts have progressed sufficiently to the point where they may be deemed tentatively ‘ ‘ cured ’ ’.
Other than Dr. Efran Namirez, the Director of ASA, whose function is mainly administrative, there is only one other psychiatrist connected with ASA. His duties, too, are more as a supervisor rather than a treating physician. It would appear that any mental treatment that might be required by an addict must be obtained from the regular prison psychiatric staff.
The NACO was established in 1966 by article 9 of the Mental Hygiene Law in a “ comprehensive program to combat the effects of the disease of drug addiction.” (Mental Hygiene Law, § 200, subd. 1). The program was adopted because the problem of drug addiction had reached epidemic proportions in our society causing “ human suffering” and “ social and economic loss ” (ibid). The right of the Legislature to enact such a program has been constitutionally upheld (Robinson v. California, 370 U. S. 660; Matter of James, 22 N Y 2d 545).
The task given to the commission includes the functions of community education, prevention, diagnosis, treatment and aftercare — and general control in the field of narcotic addiction (Preliminary Report of. the Governor’s Special Committee on Criminal Offenders, p. 269).
Under the contract entered into between the State and the city, the ASA was created to administer the rehabilitation of convicted addicts committed under section 208 of the Mental Hygiene Law.
Respondent herein objects to the court’s inquiring into the efficacy of the ASA program in New York City. The jurisdictional basis for the court to inquire into whether rehabilitation treatment is being afforded relator is more fully set forth in the court’s prior decision herein (N. Y. L. J., July 23,1968, p. 11, col. 5).
There is no question that confinement of relator for a period in excess of that provided for in the Penal Law could not be based purely on his status as an addict. Justification for holding *62 him in custody for a maximum period of three years may be predicated solely on the basis that such additional term is required to effect treatment for his addiction. Absent such rehabilitative treatment, his continued confinement became purely custodial and is legally untenable (Robinson v. California, supra; People ex rel. Ceschini v. Warden, 30 A D 2d 649).
At the outset, it should be noted that it is not for this court to determine the nature of the treatment to be given nor the facilities to be furnished. The commission, with its expertise in the field, ought to be left to determine the method of care and treatment best suited for achieving its established purpose. It is only where the court finds that the treatment offered is so meaningless, that as a matter of law it is really no treatment or where the claim of treatment is a mere pretext to keep an addict in custody, that the court is under a duty to intercede on the addict’s behalf (Sas v. State of Maryland, 334 F. 2d 506; Darnell v. Cameron, 348 F. 2d 64, 68). Counsel for relator urges that the present ASA program has no rehabilitative efficacy whatsoever, and therefore, relator, and others similarly committed, must be released.
Upon a review of the facts in this case, the court is not prepared to find that the narcotic program presently offered by the ASA is totally without merit. However, the evidence adduced does show serious flaws in the present approach to the problem. Though millions have been spent in setting up this program, the results have not been too encouraging. To date, only 20 to 25 criminal addicts have been provisionally designated as rehabilitated. A critical problem which seriously threatens the program’s success is the refusal by the committed addicts to participate. As previously stated, over 50% of the addicts presently in custody by their own choice do not take part in its rehabilitative plan and receive no other treatment or therapy. The ASA appears to be making no serious effort to remedy this situation. So that, at the present time, only half the addicts at Hikers Island have any hope at all of being discharged or rehabilitated. In addition, any chance for success is further hampered by the lack of separate housing facilities at the prison for the addicts and the absence of competent professional persons who can minister directly to the addicts. The ASA does not offer to the prisoners any routine psychiatric or psychological treatment. In fact, there is little, if any, professional attention given during the initial motivational phase of the agency’s program. Major responsibility for making the very vital first phase work is placed upon addict-group leaders who themselves are in the same program. They in turn are super *63 vised by a director and assistant director who are former addicts. Well-meaning as they may be, these persons have little, if any, formal education. Except for some scientific jargon, they may have gleaned during their own treatment, they seem to operate to a large extent on their own intuition. The fact that 50% of the addicts have not been, motivated to accept help indicates a need for some serious reassessment as to what additional aids may be provided to supplement the role these addict-group leaders play in the program. Moreover, it appears to the court that the officials of the agency who are responsible for such an important program, should visit the facilities at Bikers Island at a greater frequency than the testimony showed so that the progress of the program can more properly be directed.
Upon a review of the evidence adduced at the hearing, it is apparent that the ASA program on Bikers Island, as it is presently constituted, offers to the criminal addict a minimal amount of rehabilitative services.
It was certainly not the legislative purpose in creating this program to provide the addict with merely so much treatment as is minimally necessary to justify his additional prison term.
The court is aware of the dangers inherent in the application of New York State’s new and radical approach to the problem of crime and narcotics. In essence the State Legislature has rejected the theory that every person has the free will to choose between right and wrong. Instead, it substitutes the concept that drug addicts are compelled to commit crimes to satisfy their habit. For these addicts the State would substitute treatment for punishment in the conventional sense and would release the addict not when he has paid his debt to society but when he has been sufficiently cured to make it reasonably safe to release him. With this humane approach to the terrible problem of drug addiction, no person can find fault. But such a program of confinement until cured ‘ ‘ may be fraught with the possibility of abuse, in that if not administered in the spirit in which it was conceived it can become a mere device for warehousing the obnoxious and antisocial elements of society ” (Sas v. State of Maryland, 334 F. 2d 506, 516).
The State narcotics program, as administered by the ASA cannot be permitted to stagnate, nor can these addicts be ignored once placed in custody. It is apparent that what is needed is some objective administrative board not wedded to any particular form of treatment which can evaluate what progress, if any, is being made, and mandate change if required.
Still, whatever its present shortcomings, New York State’s new and revolutionary approach to drug addiction and crime *64 should he given every chance to succeed. Some addicts are participating in the city program and some progress has been shown. The experimental nature of this program is obvious, and trial and error must be permitted if an effective and efficient program is to be evolved. The courts should not thwart the legislative purpose in enacting article 9 of the Mental Hygiene Law by prematurely interfering in its mechanics. For the reasons stated, relator’s writ is dismissed.